The Patriots USA, Inc. v. Houchul Yes, hold on one second. Okay, I'm sorry. We'll move on to the next case. Thank you, counsel. Okay. Berrara v. The New York Hotel Trades Council, number 20-3092. Mr. Davich? Yes, good morning, Your Honors. I am Robert Davich. I represent the appellant in this case, Dr. Mustafa Berrara. This is an appeal from an order by the District Court granting summary judgment in favor of the defendant. We will call the defendant for funds and against Dr. Berrara on his claim that he was terminated by the funds on August 10, 2015 because he had a disability in violation of the ADA and the state and local statutes that prohibit disability discrimination. Your Honors, this is not about whether or not Dr. Berrara will win if the case goes to trial, if he's fortunate enough to get a trial. It's about whether or not he is entitled to a trial. And our position is that based on the record that was developed in discovery, he is in fact entitled to a trial, particularly on the issue of pretext. And there are five ways, we think, in which he could establish pretext, either alone or in combination, if he ever were to go to trial. And I think it would be a good idea for me to summarize briefly some of the salient facts. And everything I'm going to say, I believe, is supported by the record, so I won't keep saying so-and-so testified. It has to be a pretext for discrimination. Yes, a pretext for discrimination because of his disability, which resulted from a fall that caused nine fractured ribs and a torn right rotator cuff. He slipped and fell on May 12, 2015 in a hospital. He is a licensed OBGYN. He was hired by the funds in January of 2010. As a result of the injuries he sustained in his fall, he was out of work until May 31. A physician cleared him to return to work as of May 31, but did not say in his note that he was fully recovered or that he had no restrictions. On the day he was supposed to go back to work, June 1, 2015, he calls his supervisor, the medical director of the health center, Dr. Sweeting. And he says to Dr. Sweeting, quote, I am unable to move my right arm, end quote, end quote. I cannot see the patients because I'm just unable to move. I'm in so much pain, end quote. According to his testimony, Dr. Sweeting's response was, I don't care. This is not my problem. You must come in and see the patients. He returns to work on his next scheduled work day. He didn't have any choice. June 4. And on at least three occasions after he went back to work, he told Dr. Sweeting that he still couldn't move or lift his right arm. He had been cleared medically by his doctor. He had been cleared to return to work. Yes, Your Honor, that is correct. So Dr. Sweeting, from her point of view, this is a person who's been cleared by his own doctor. Right. However, as the district court pointed out, Dr. Barora's testimony was that he kept telling Dr. Sweeting after he returned to work, I can't move my right arm. I'm having trouble treating patients. I'm in severe pain. And I'm actually having to use my left arm to move my right arm. That's his testimony, and he said that in his answers to interrogatory. So let's move to what happened here. July 9, 2015. That's about six weeks after he returns to work. He's scheduled to work from 1 p.m. until 7 p.m. On that day, he goes to the radiology department for several minutes to have his right shoulder x-rayed and did not cause any disruption in his patient's schedule. About an hour later, at 5.30, he sees an endocrinologist in the same building where his office was located because he was concerned about cancer. There was a nodule that appeared on a PET scan that showed his fractured ribs, and he wanted to see the endocrinologist to rule out cancer. He's away for that appointment for no more than 10 minutes. He testified that when he left, there were no patients waiting for him. He was only away for about 10 minutes, and then when he came back to work, his next scheduled patient was checking in at 5.40 p.m. The records show that at that point, he only had three more patients left to see for the rest of the day before he checked out at 7 o'clock. Now, Dr. Sweeting confronts him on July 9th and says, You can't see doctors for your own problems when you have other patients scheduled to be seen by you, and I should know about it at least. He defends himself to Dr. Sweeting. He says, Doctor, I was only away for a few minutes. I had no patients waiting for me. There was no disruption in my schedule. Nevertheless, on the next day, July 10th, Dr. Sweeting sends an email to her boss, Dr. Jarvis, the CMO, and she says she found five patients waiting for Dr. Garora when he was visiting the endocrinologist, and, quote, Above all else, the patients were inconvenienced with longer than necessary wait time and later than necessary departure. End quote. Now, the district court found that the events of July 9th were the precipitating factor in the recommendation to fire Dr. Garora. And, in fact, the fund has admitted several times in their brief that that was what caused his termination, what he did on July 9th. Our position is that under the fund's own policy, an unauthorized absence from an assigned work area during working hours is a minor infraction that will lead to progressive corrective action. And, nevertheless, he was fired. We say a jury could find that what he did fits within that definition, unauthorized absence from an assigned work area during working hours, minor infraction, progressive corrective action, and yet he was fired. So that's your pretext argument. I'm wondering if you could back up to the part of your prima facie case. You have to allege that his disability was the but-for cause of the termination, and I'm wondering what's the strongest evidence in the record that you can point to. You're asking about the prima facie case, Your Honor? Yeah, just what's the evidence, the strongest evidence in your view that disability was the reason for his termination? Okay, so for prima facie case, first of all, under Second Circuit authority, it's a low standard. It's been described as a minimal or de minimis standard. That's the initial prima facie case. Right. But that ends when the employer comes forth with an explanation for the reason. At that point, the initial prima facie case just disappears. Correct. So the prima facie case we're talking about here is sufficient evidence to make it reasonable for a jury to find. Right, and the district court found that he had made... So minimal doesn't apply to that. Right, the district court did find that he'd made out a prima facie case, and our position is the same evidence that enables him to prove pretext makes out his prima facie case, and there's a decision by the Second Circuit, this court, in Van Cronk... But the pretext issue turns on, it seems to me, the factual dispute over whether this was a major or minor infraction. Yes, Your Honor. And I hear your argument on that. But how does that tie back to whether the but-for cause of the termination was disability? Well, it doesn't have to be the but-for cause. Under the Natosky case, it has to be a but-for cause, not the sole cause, and our position is that when we combine all the proof of pretext and prima facie case, a jury can determine that he was fired because of a disability. There's no direct evidence. I mean, there's no testimony that Dr. Sweeting said to you, Dr. Brewer, we're firing you because you have a torn rotator cuff. It has to be inferred. It can be inferred by the jury. Violation of the policy, that's number one. Number two, the funds changed their position in the litigation. It became theft of time in the litigation, and there's law that says when the explanation shifts or changes, that can be evidence of pretext. So now it's theft of time. He was never accused of theft of time before he was fired or at the time he was fired. Theft of time under the policy is a major infraction that can lead to termination, unlike a minor infraction such as an unauthorized... The underlying conduct hasn't changed, right? It was taking personal appointments during his shift. And so during litigation, they label that as theft of time, I assume, because that's what the policy language is. But that doesn't seem to be a change in the reasoning. Your Honor, we think that's a jury question. A jury can interpret the policy and decide whether it was really an unauthorized leaving of his post for ten minutes, which would be a minor infraction, or whether it was theft of time, which would be a major infraction. That became an issue after the litigation started. But there's one other point that I want to make. Sweeting mentioned several different things. Sweeting didn't limit the reasons of his misconduct to that. Sweeting also mentioned that he incidentally had requested to be put back on the work schedule after his doctor cleared him. And on June 1, when he was supposed to be there, he simply didn't show up. He didn't notify anybody. He didn't tell anybody. He just didn't come. Your Honor, the record shows that he did call Dr. Sweeting that morning, and he said, I can't come in because I can't move my arm. And he wasn't punished at that time on June 1. That didn't come up as a reason until a month later on August 15, when Dr. Sweeting adds that to another memorandum. He goes back to June 1. In the initial July 10 memo, she says nothing about him skipping work on June 1. It comes up for the first time as an added reason on August 10. The other point I want to make is that there's a core factual dispute on whether or not he committed the conduct that he was accused of. And under the Supreme Court's decision in Sanderson, I believe that should go to the jury. Dr. Sweeting said that in her July 10 memo recommending termination, that she found five patients waiting for him in the OB-GYN clinic when he was visiting the endocrinologist. And above all else, those were the words she used, above all else, patients were delayed and inconvenienced. Dr. Barora testified, that's not true. There was nobody waiting. There was nobody there. When I left, there was no patient there. When I came back, my next patient was checking in. That is a key factual dispute. And I submit to your honors that if the jury were to find that Dr. Barora is credible, and by the way, no patient gave testimony or a declaration. If the jury were to find that Dr. Barora is credible when he says, there was nobody there when I left for 10 minutes, my next patient was coming in, the jury under the case law can find a pretext. The primary asserted reason in that July 10 memo would then be determined to be false. And the only other point I want to make, I'm sorry I'm over time, is the issue of temporal proximity. He tells Dr. Sweeting on June 1 that he can't move his arm, he can't go to work. He then says to her several times after that, I can't move my arm, I can't lift my arm. On July 10th, she recommends termination. Now, temporal proximity, standing alone, is not enough to establish pretext. But under the case law, in combination with the other facts that I've mentioned to your honors, that can be used by the jury to find pretext. There's a Second Circuit's decision that holds that a time interval of five months is not too short to find temporal proximity. In this case, we have within six weeks. Thank you, your honors. Thank you, counsel. Ms. Schmaltz. May it please the court, my name is Jennifer Schmaltz. I'm Ellen Hoff Grossman and Scholl. And I'm here on behalf of my client, which is the New York Hotel Trade Council and Hotel Association of New York City Employee Benefit Fund. And just to clarify, my client is a Taft-Hartley Multi-Employer Benefit Fund that services union employees in the hotel industry throughout New York City. And one of the funds is the Health Fund. And the Health Fund, which is funded by hotel employers, runs four health centers, one of which is the Queens Health Center, where Dr. Barrara was employed on a part-time basis. And Dr. Barrara also maintained his own OBGYN practice. But he worked a couple of days a week. He was an hourly employee. He was paid approximately $80 an hour by the fund to service the patients who were there, who are members of the union, who are there and their families for health services. And he had a schedule. He was expected to be there and abide by the schedule. And in the record, in the joint appendix, you will see on the day July 9th in question, when he attended these personal health care appointments, if you look at the joint appendix, 130 to 132, it is three pages of the patients who he was scheduled to see that day. And those patients, some of which were scheduled at exactly the same point in time when he was supposed to be seeing patients, he was in fact not once, but twice left the OBGYN to attend to his own medical needs. And that, your honors is theft of time. That is a dereliction of duties. It is, it is leaving your work area when you are being paid to attend to patients. And instead he was not doing what he was being paid to do by the fund. Now on. Dr. Sweeting, your adversary argues did not call that at the time. That seems to be a label that was added during litigation. What's your response to that? Yes. Dr. Sweeting in her, in her July, in the memo that she wrote, it's an email actually that she wrote to her supervisor, Dr. Jarvis, the very next day, July 10th, after the incidents occurred, she said that he went, he left, he kept patients waiting and that he, you know, left and went to see an endocrinologist and he went to radiology. Even though she didn't specifically label that as theft of time, she was communicating to her supervisor, what had happened. And Dr. Sweeting is a physician. She's not a human resources representative. You know, she was conveying what had occurred, but the fact of the matter is when an employee is on the clock and they're expected to be working and they leave their work area to tend to personal business, that is not permissible in any workforce that I'm aware of. That is theft of time. You are expected when you are at work to be performing the services that your employer is paying you to do. And in this, in this circumstance, that was not what occurred. So, and I would like to address that argument about failure to follow the handbook or the company policy. The handbook, which is in the record, again in the joint appendix, also shows that theft of time is a major infraction. And I also would like to point out that it is very well settled in these, in the courts, that in discrimination cases, the courts are not supposed to serve as super personnel departments. You are not supposed to second guess an employer's decisions in its disciplinary actions. And here, that's not what's at issue. As long as it's clear that the employer relies on its policies in making those decisions, which clearly here it did, it clearly relied on its policies as outlined in the reasons for termination. In that case, the courts do not second guess the personnel decisions of employers. The issue here is whether there's a discriminatory motive, whether they can prove pre-tax. And the fact is- You're not saying, are you? That, I mean, supposing that there were a case in which there was substantial evidence of a discriminatory motivation, you're not saying that the fact that the employer can dress it up as a, placing the reason as something that came within a policy, if a jury would find this employer was discriminating against this class of persons, that the fact that the employer can point to a policy that could explain it will prevent the court from finding discrimination that was obviously present? No, absolutely not, Your Honor. Mr. Davich, what he argued was that this is a minor infraction, that he should not have been terminated for this. And what I'm saying is the decision to terminate the level of discipline is something that the court pleads to the employer. I agree with you 100%. If there was evidence here in this case of discriminatory motive, an employer can't just point to their policy and say, this is why we made this decision. But the fact of the matter is, is there is not evidence here of discriminatory motive. And the allegations that there was some kind of shifting reasons for why this decision to terminate was made is entirely inconsistent with the record evidence. Both memos, both the email in July and the final termination recommendation subsequently submitted by Dr. Sweeting, both rely on this conduct of July 9th. Now, she does cite to some prior disciplinary issues, which is not uncommon in the human resources world. When you are going to terminate someone, you reflect on their entire, their employment record. And she mentioned the fact that Dr. Barrara on June 1st, the day that he had asked to be put back on the schedule, the day that he had said he had actually gone in, presented the note saying, I'm cleared to return to work, put me back on the schedule. And that very day he did not arrive for work. And you're correct, your honor. He did not call human resources. It's in the record. No other human resources contacted him. And he admitted in his deposition testimony that he just didn't show up for work that day. And again, that is something that is no, no employer is expected to tolerate that. Now he was not terminated for that because that is not, that was not considered at that time, an offense serious enough to terminate his employment. But the offenses that he committed on July 9th, clearly are the impetus for, for his termination. They were the event, the leaving his work area. Certainly entitled to consider a cumulative series of misconducts. Even. I mean, it's not unusual for an employee to commit a misconduct, which then passes and results in no discipline, but then becomes a factor when it's added to later, repeated later infractions to, to be added to those as a reason for a termination. Absolutely. And your honor, this, these emails and memos that were being sent were being sent to Vincent Jarvis, who was the medical director for the entire fund for all of the health centers. And I believe that, you know, if you look at this July, July 10th email, it's copied also on Serena Jean-Louis, who was the administrator for the fund. She was the administrator for the Queens health center. She was present there that day as well. And in the email, I think the motivation is very clear of, for during tweeting for Dr. Sweeting in terms of why she was recommending the termination. She said above all else, the patients were inconvenienced with longer than necessary wait times and later than necessary departures. Serena and agreed that termination is appropriate at this time. And whether it was one patient, three patients or five patients waiting for, for Dr. Barara is irrelevant. That fact doesn't change. That doesn't create an issue of whether this, this case involved disability discrimination or whether Dr. Sweden was motivated by disability discrimination. The fact is he had a schedule of patients and his dedication should have been there to seeing those patients during that period of time. And instead he chose to, he chose to attend these medical appointments, you know, instead of dedicating himself to seeing the patients and the employer, the funds, the health center has the right to expect him when he is on the job and being paid to be dedicated to the schedule of patients that he has. So in conclusion, your honor, the funds request that you affirm the very well thought out and very meticulous and detailed decision that judge Freeman issued the memorandum in order of granting our motion for summary judgment. Thank you very much. Thank you counsel. We'll take the case under advisement. The next argument will be in ESCO versus IBM number 20 dash 33 72. Mr. Webber, whenever you're ready, may it please the court. I have two brief opening points about Penn Plaza. First, the OWBPA by its terms applies to the waiver of quote, any right or claim and quote under the ADA. Given that plain meaning of that statutory language, it is highly implausible that the Supreme court in Penn Plaza was holding that the OWBPA only applies to substantive rights. And even more unlikely that it would vary. Why is that implausible? The Supreme court held that it didn't include the right to arbitrate and it applied to substantive claims only. The holding in Penn Plaza is unequivocal. They expressly state what their holding is and your honor is absolutely right. They held that the ADA does not in any way prohibit finding arbitration in a pre dispute or post dispute. And we have never contested that. We have agreed to arbitration in this case. So that is a, that is a red herring in this case that the IBM keeps raising that we're somehow foreclosing that. But actually your honor under section H, which is the section of the OWBPA that we're focusing on, not discussed, not mentioned in Penn Plaza, that's a post dispute provision that only requires disclosures. Unlike C, which is an absolute ban on prospective waivers, which is problematic. Can you raise the, can you raise the podium so that you're speaking more directly or raise the microphone so you're speaking more directly into them? I'm sorry. How about if I get closer? Is that better? That's better. Okay. So our case is focusing on subsection H, which is completely different than C. C was, had a sentence in Penn Plaza where they said that looks like that would conflict with our prior holding in Gilmer that binding arbitration is not ADA. We don't contest any of that. We never have. So the only thing we're relying on is H and if IBM had complied with H, they could have insisted on an individual arbitration action. So there is no tension here with the federal arbitration act as there was obviously in all the cases they're citing. So those cases are totally distinguishable on that ground. And the reason judge Park, I say it's implausible is the U S Supreme court has made it very clear time and again, that the focus in statutory interpretation is on the plain meaning of the words. And nobody would, I don't think any of us here would say the best way to convey only substantive rights is quote, any right or client that would you'd flunk out of writing class if that was your proposal. And so the U S Supreme court was what it was doing. Your honor was responding. And it said that, and I think the district court and IBM keep not paying attention to the U S Supreme court sentence. It begins with respondents incorrectly contend. And then the quote of substantive comes from the respondents argument, which makes perfect sense because they're responding to response argument. It nowhere is in the ADA. And I don't think the Supreme court would ever be so disrespectful of statutory language to begin an interpretation of a statute by taking out the word any and putting in substantive. That just is not the Supreme court would never do such a thing. So it doesn't make any sense the way this has been interpreted. It's a very long decision. And the WPA is discussed for a couple of sentences at the end of a single paragraph. There's no way that Supreme court would bury such an important holding at the end of a paragraph. And it is describing in a quick way, why it doesn't agree with a respondent's argument, which we're not making. We're not arguing that there's any substance. Maybe I'm just not getting it. I'm sorry that I don't understand your argument. And why Penn Plaza isn't controlling here. It just seems to me that the analysis that the Supreme court provided about arbitration is that the question is whether that applies to collective action in this case. Right. So not following why it doesn't. Right. So this is a section H case, your honor, which does not, there's no tension between it and arbitration because it's the same requirement for a contract that doesn't have arbitration. If you make the disclosures that Congress thought older workers needed to know before they could make an informed decision, then you can get a complete waiver. That would include requiring arbitration and an individual action. So there's no tension here in the other statutes. The other cases, the statute has interpreted the way the petitioners were saying would preclude arbitration or preclude individual arbitration. We're not saying that at all. So Penn Plaza in no way address this issue because there's no, obviously the federal arbitration act is very important. Let me ask you if I understand the point you're making or the issue. As I understand it, looking at the crucial passage of Penn Plaza, the Supreme court said plaintiffs incorrectly argue that an individual employee must personally waive a substantive right. And plaintiff had argued that it must be a substantive right and the Supreme court inserted substantive into the sentence, must waive a substantive right to proceed in court for a waiver to be known as voluntary as explained below. However, the agreement to arbitrate ADA claims is not the waiver of a substantive right. Now, what I, what I gleaned from that is that the plaintiff, the plaintiff has taken the position in, in that case, that section 626 F applies only to substantive rights. And then the Supreme court proceeds to say, accepting that as a given, but never, never treating it as an issue that needs to be decided. Does the, does section 626 F really apply only to substantive rights or to all rights? Supreme court accepts the way the plaintiff characterizes it and then simply says, yeah, well an agreement to arbitrate is not, is not the waiver of a substantive right. And so the Supreme court, while it has said that it has said unquestionably, or at least it has assumed that the ADA, that section 626 applies only to substantive, substantive rights. It never treated that as an issue that needed to be decided because the plaintiff was conceding it. And so the Supreme court simply took it as a, as a given and didn't decide the question. It just treated it as if it's true. Nobody's contesting that. Yeah, I can, I think that's the only reasonable way to interpret it because the Supreme court begins by saying we're responding to an incorrect argument of respondent and they swat it away and they decide that it is not a substantive right to bring a case in court. And we completely concede that. But for them to put the word substantive, to think that they were rewriting a statute openly like that, they would never do that. That is totally implausible. And judge LaValle has a article about dicta. It's really hard to say that the Supreme court was making a binding discussion about the OWVPA, any right or claim when they never even quoted, they would never ignore the word. And it seems to me that the Supreme court reasoning assumes that the, that the, that the statute does apply only to substantive rights, but it assumes that because the plaintiff conceded it, not because, not because the Supreme court treated it as an open question to be, to be pondered and decided. The Supreme court doesn't give any evidence of having raised the question whether it applies only to substantive rights or to substantive and procedural rights. It just, as the plaintiff was conceding it applies only to substantive rights and then saying, well, this is so important. It's got to be considered substantive. The Supreme court just accepted. I completely agree. I think that's, that's the, that's the smart way to interpret it. It's what the Supreme court said. They were responding to an argument and that they would have spent a lot more time looking at the actual statutory language. The only statutory language they actually quoted was section C, which is problematic in an arbitration case. We're not relying on C, C is a pre dispute provision and ours is post dispute layoffs. Disclosures only occur post dispute. There is no conflict with the federal arbitration act. And so we think this is a plain statutory language case and it, the decision should be reversed. I believe I saved two minutes for rebuttal.  You have two minutes remaining for rebuttal. Thank you very much. Thank you. Ms. Lovett. May I please support Tracy Lovett on behalf of international business machines corporation. Judge Park, we agree with your reading of pen Plaza in our view, it establishes the rule of decision. In this case, the court held that section six, two, six F one waiver limitations apply only to substantive rights, not to the right to bring a civil action in a judicial forum or the right under the seventh amendment to the civil jury trial. Judge Laval in response to your questioning about, you know, what was before the court? Was this an assumption? We agree with the district court that you should go back and look at the briefing. And I would commend to you, and I'm pleased as though the Westlaw site, the pinpoint sites on Westlaw. So respondents brief at three star, three star, 13 star 31 and star 36. Star three is the introduction. Star 13 is the summary of the argument. Star 31 is the argument about the right to a judicial forum. Star 36 is about the jury trial, right? And what the petitioner, excuse me, the respondent is arguing in that case is that the arbitration clause is invalid because six, two, six F one requires rights to be waived individually. It has to be a personal waiver and a waiver by union is not an individual waiver. The petitioner, I'd also commend to you the petitioner's reply brief, which is 2008 Westlaw, three, eight, five, one, six, two, two at star 16 and star 17. The petitioner responds to this argument by saying, no, no, no. Right. Means only substantive rights and the right to judicial forum and the right to a jury trial are not substantive rights. That's the analysis before the court. That's the argument before the court. When it says that two 59, it's a substantive right. And I, it's meaningful. The court is equating the term right with substantive rights. And it's clearly quoting 29 USC, six, two, six F one, not citing the response brief. And even if you don't like the textual analysis, even if you think it's, you know, Not, not as clear as you would draft it. The court is very clearly drawing the line in 14th and Plaza. It's saying, look, substantive rights are within the scope of section six, two, six F one, the right to a jury trial and the right to bring a civil action in a judicial forum, which is guaranteed under six to 61. Both of those rights are out. So the question before the court, no matter how you read 14th and Plaza is where on that line. Do collective actions fall. Do they fall closer to substantive rights or do they fall closer to the right to a jury trial and the right to judicial forum? I think that question is pretty clearly answered by the Supreme court decisions in Gilmer, Italian colors, and this court's decision in Southerland. In all three cases, the court considered the nature of a collective action and whether it's actually substantive. And in all three cases, this court and the Supreme court held that collective actions are not substantive. Right. For exactly the same reason why a judicial forum is not a substantive right, because you can vindicate the underlying right guaranteed by the ADA and an individual enforcement action. That's why collective actions aren't required. And this was the analysis in Southerland. There's nothing that forces a litigant to opt into a collective action. There's nothing that requires a litigant to bring a collective action in a judicial forum. That's because Congress determined that the individual enforcement mechanism was as effective as the collective action. That's the logic of 14th and Plaza. And it applies squarely in this case. I, there was a little bit of conflation I think in the appellant's argument about our arguments under the FAA and our arguments under 14th and Plaza. Our argument under the FAA is even if you disagree with us and you think this is not, hasn't been decided by the Supreme Court and you disagree and you think that 14th, that OBIPA actually covers and encompasses the collective action, you have a conflict between the Federal Arbitration Act and 626F1, the OBIPA. Because, you know, we don't, if we learn anything from Stolt-Nielsen and Concepcion, it's that a party can't be forced into collective arbitration against their will. And in the reply brief, appellants are pretty clear that that's exactly what they seek here. They want to go to arbitration where, quote, not doing anything to the arbitration rights, but require IBM to do so without the benefit of the collective arbitration waiver to which the parties expressly agreed. That's the conflict with the FAA. Epic tells you that written agreement is, I think the court's phrase was, pretty absolutely guaranteed by the Federal Arbitration Act. So this appellant has three answers. And I think it's worth taking a couple of minutes just to tease through those because of the way the briefing fell, we didn't have an opportunity to reply. The first argument is that the OBIPA is its law of general applicability. And so it's a defense, a contractual defense that falls within the FAA stating clause. Well, that was true of the laws that issue in Concepcion and Epic and in Lance Plus. And the court expressly acknowledged the fact that those laws were generally applicable. But the court held that didn't save the contractual defenses because they interfered with a fundamental aspect of arbitration, which is the right to bilateral arbitration, the right to individual arbitration. The same is true here. If the appellant's reading of 626F1 is correct, then you have a transformation of the arbitration agreement into something that IBM does not agree to. Their second argument is that, and this is what I believe my brother counsel was alluding to, was that the disclosure requirements in OBIPA are merely conditions. They aren't an actual prohibition on a collective arbitration waiver. I think that the line in the reply brief was, IBM just needs to disclose. And if IBM discloses, it can have its collective arbitration waiver. But here, too, that was the same factual setup in Epic and in Italian Colors. In Epic, the NLRA provision, which guaranteed concerted activities, applied only to employer-induced agreements. It did not apply to union agreements. It did not apply to collective bargaining agreements. So the condition was, if you want your collective arbitration waiver, just do it through the union. You can't do it through an employer agreement. But I think Italian Colors is even more Italian and more on point. In that case, the court was considering the effective vindication defense. And at the very end of this opinion, the court says, if the effective vindication defense operated in the way the lower court says, you'd have judicial review of every arbitration agreement, and you'd have the court giving green light or red light on arbitration. What did this arbitration agreement say that you rely on? Our arbitration agreement? Yeah. It says there's an express provision that there would be no— I can grab it for you. This was the agreement that exhibits the complaint. So if you wanted to pull the docket, it's docket one. I'm sorry. I don't have this right. Okay, here it goes. You agree that—and I'm going to do an ellipse in here. You agree that any and all legal claims or disputes between you and IBM under the Federal Age Discrimination and Employment Act, dot, dot, dot, will be resolved on an individual basis by private confidential final and binding arbitration according to the IBM arbitration procedures and collective action waiver. Then there is a carve-out, and the reason why we're in this court, there's a carve-out for any questions on the enforcement of the collective arbitration waiver shall be decided by a court, not the arbitrator. So it's in there twice, but it's expressly requiring individual arbitration between the employee and IBM. So your point is, with respect to the FAA, that the arbitration agreement limits to individual arbitrations as opposed to collective arbitrations? Correct. Correct. And so you have to rewrite the agreement, and there's another provision. I just don't have it straight at my fingertips, which is more expressive about the collective action waiver, that you'd have to read that out of the agreement, and Concepcion and Stolt-Nielsen tell you you can't do that. But very quickly to this last point about Italian color. Well, in that analysis, the 626 in Penn Plaza issue is simply irrelevant. You would get to this issue only if you disagree with us on 14 Penn Plaza. So if you read 14 Penn Plaza as not supplying the role. Well, and vice versa. Correct. Correct. So the district court didn't decide this issue because it agreed with our interpretation of 626F1. And so you can affirm on that ground that this is, if you disagree, you do have to go through the FAA analysis. And in our view, there's no clear or manifest intent within 626F1 to overcome the arbitration right. Thank you. Thank you, counsel. Mr. Weber, you're served two minutes for rebuttal. So in Penn Plaza, IBM admits they never quoted any right or claim. And there are sites to the brief below. I mean, when you read a Supreme Court decision, the Supreme Court said what it was responding to and quoted substantive right. So the ultimate authority on what they were doing is the decision itself, just like a statute. So I don't think you want to go into legislative history on that. So Penn Plaza, as the court has indicated, says they're responding to an argument, and that's why they put the word substantive in there. The idea that they put that in there and rewrote the statute in the first sentence of discussing it is just totally contrary to everything the Supreme Court says about the statutory interpretation. On the Federal Arbitration Act, it's just not true that we in any way were messing with their rights to bring, to compel arbitration in an individual action. All they had to do was comply with H, which applies to contracts. I think there's no question from what the Supreme Court said that it was operating under the belief that the provision applies only to substantive rights. For purposes of swatting away that argument in Penn Plaza, but not for all future... I mean, it simply assumes that the statute applies only to substantive rights, and it says this isn't a substantive right. I completely agree. And so in no way was it meant to be controlling in the future. So under the Federal Arbitration Act, there's no conflict here because Section H applies... If they had just done a regular contract here and left that arbitration, it still would be invalid because they didn't make the disclosure. So IBM is saying we're forcing them into something. We didn't. All they had to do was comply with H, whether it's a regular contract or an arbitration contract. It is a generally applicable rule that Congress says, we think you need to make these disclosures, otherwise it's essentially coercive or fraudulent. And so this is a generally applicable defense. Can you say in response to IBM's argument with respect to the arbitration agreement being limited to individualized arbitration? I'm sorry. That would not be a problem if they complied with H. We admit that it's totally enforceable. But an arbitration agreement is not a super contract. It doesn't get around things that other contracts have to comply with. So in this instance, H just says, you've got to make disclosures, and then you can get anything you want waived. And so they could have had their cake and eat it, too. They just didn't want to make these disclosures. But they can't get around that by having an arbitration agreement, Your Honor, just like they could with a contract. An arbitration agreement is not a super contract. It just can't be treated worse than a contract. This would be taking the Federal Arbitration Act and taking it a way mile further than the Supreme Court has ever done to strike down a disclosure requirement. They've never done that. As a matter of fact, I believe they've indicated that would be okay. That's not the same as banning it. It doesn't interfere with it. It doesn't disfavor it. It would be taking the Federal Arbitration Act and making it trump, basically put arbitration agreements above the law. Thank you. Thank you, counsel. We'll take the case under advisement. Before hearing the last case, we'll take a five-minute break and be back, but you all can set up. The next case will be Citibank versus Brigade Capital, number 21487. For sentencing reasons. Thank you.